**Office of Disciplinary Counsel v. Levine**

Disciplinary Board Docket no. 163 D.B. 2004.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

NEWMAN, *Member,* February 13, 2006—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court

with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On October 28, 2004, Office of Disciplinary Counsel filed a petition for discipline against Michael Levine, respondent. The petition charged respondent with failing to provide competent representation to clients in three separate immigration matters in the State of Florida. On December 17, 2004, a stipulation in lieu of answer was filed jointly by petitioner and respondent.

A disciplinary hearing was held on February 28, 2005, before a District III Hearing Committee comprised of Chair Charles Owen Beckley, II, Esquire, and Members Lawrence B. Abrams, III, Esquire, and William A. Fetterhoff, Esquire. Respondent appeared pro se.

Following the submission of briefs by the parties, the Hearing Committee filed a report on August 29, 2005, finding that respondent engaged in professional misconduct and recommending that he be suspended for a period of one year and one day.

A brief on exceptions was filed on September 28, 2005, by counsel for respondent, Samuel D. Miller, III, Esquire, who entered his appearance on September 9, 2005. A brief opposing exceptions and motion to reopen the record was filed by petitioner on October 17, 2005.

This matter was adjudicated by the Disciplinary Board at the meeting on November 9, 2005.

## II. FINDINGS OF FACT

The board makes the following findings of fact:

(1) Petitioner, whose principal office is located at 200 North Third Street, Suite 1400, Harrisburg, Pennsylvania 17101, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent, Michael Levine, was born in 1943 and was admitted to practice law in the Commonwealth in 1975. He maintains his office at 1133 S. University Dr., Suite 211, Plantation, FL 33324. He is subject to the disciplinary jurisdiction of the Disciplinary Board of the Supreme Court.

(3) Respondent has a prior history of discipline consisting of a private reprimand with conditions imposed in 1997. A one-year period of probation was also imposed. During the probation, a practice monitor was appointed to review respondent's handling of funds and maintenance of records and to file a report every two months. Respondent failed to comply with his probation and it was extended for an additional year. Respondent's psychiatric problems were a factor in determining that private discipline was appropriate.

*Charge I—Theresa Jolly Matter*

(4) In October 2001, Theresa Jolly, formerly known as Theresa Knowles, went to respondent to help change her immigration status to become a permanent resident. Ms. Jolly's sister, Pauline Holland, had filed a petition on Ms. Jolly's behalf to change her status in 1979. How-

ever, Ms. Jolly had been unaware that Ms. Holland had arranged an appointment with the Immigration and Naturalization Service (INS) to change her status in 1979, until she came across a letter which had been in her mother's possession until her death. Ms. Jolly wanted to know whether it was still possible to change her status.

(5) At a meeting in October 2001, which was attended by respondent, Ms. Jolly and two others, respondent advised Ms. Jolly that if her application was still open, she could complete the process to become a permanent resident in the United States or in the Bahamas through the Bahamas Embassy. Respondent further advised her that her husband and children could become permanent residents as a result of her status, as long as her children were less than 21 years old.

(6) At that meeting, respondent advised Ms. Jolly that he would charge her $3,000 to get her and her family's status changed. Respondent requested a $1,500 deposit from Ms. Jolly.

(7) On May 2, 2002, Ms. Jolly paid $500 toward her retainer.

(8) On May 13, 2002, Ms. Jolly gave respondent an additional $2,000 and signed a retainer agreement.

(9) On May 13, 2002, respondent advised Ms. Jolly that her file was in the federal archives, and that he needed to look for the file. Respondent estimated that it would take about six to eight months to finish this immigration work if Ms. Jolly stayed in the United States. Ms. Jolly told respondent that she preferred to complete the process from the Bahamas.

(10) On May 31, 2002, Ms. Jolly and her two sons went to respondent's office. Respondent requested that Ms. Jolly pay him an additional $2,400 as a filing fee. Ms. Jolly paid respondent $2,400 that day.

(11) Respondent deposited the money shortly thereafter.

(12) In June 2002, Ms. Jolly called respondent on numerous occasions to check on the status of her case. Respondent advised her that he went to get her file from the archives and he was not able to see the supervisor.

(13) On June 18, 2002, respondent hand-delivered a letter to Stephanie Black at the INS and requested that she pull Ms. Jolly's file and check the status of her case.

(14) On July 2, 2002, respondent telephoned Ms. Jolly to tell her that the file was active, but he had not obtained it.

(15) Ms. Jolly received an invoice dated July 10, 2002, requesting an additional $1,500.

(16) After receiving the invoice, Ms. Jolly telephoned respondent to complain because she had received a bill requesting the balance of payment when respondent had not completed any of the work.

(17) During that conversation respondent advised Ms. Jolly that he had not yet obtained her file.

(18) On August 5, 2002, Ms. Jolly terminated respondent's representation, and requested a refund of her money. She advised respondent that he could keep $500 even though in her view he had done nothing to earn it.

(19) At the time of respondent's termination, he had still not received the file from the INS.

(20) Respondent requested that Ms. Jolly mail him her receipts, which she sent. Respondent then called and advised Ms. Jolly that he could not refund all of her money at one time. He then promised to refund between $500 and $700 by August 10, 2002.

(21) Respondent failed to refund any monies by August 10, 2002. Respondent requested that Ms. Jolly come to his office alone on the following Monday. Ms. Jolly was uncomfortable with the request and refused to do so. Respondent then promised to send her funds within three weeks, but failed to do so.

(22) Ms. Jolly informed respondent that she had spoken to the Florida Bar about his conduct. Respondent informed her that as a result of her communicating with the Florida Bar, he would have to deal with her in a way he did not want to. Respondent advised Ms. Jolly he would not refund her money until she came to his office and signed papers.

(23) When respondent found out that Ms. Jolly had filed a complaint with the Florida Bar, he wrote a letter to her dated September 12, 2002, requesting that she and her sister come to his office. Respondent advised Ms. Jolly that he was prepared to return her filing fees at that time.

(24) Ms. Jolly filed a complaint with the Pennsylvania Office of Disciplinary Counsel in September 2002.

(25) Respondent met with Ms. Jolly on October 25, 2002. At that time, respondent agreed that he owed Ms. Jolly $3,900. Respondent paid Ms. Jolly $500, and agreed

to send her $750 weekly until the balance was paid in full. However, after promising to refund the balance to Ms. Jolly, respondent never made any payments.

(26) In February 2003, respondent proposed that if Ms. Jolly agreed to withdraw her disciplinary complaint, he would make payment to her. She did not withdraw her complaint and respondent never made any payments to her.

(27) At this time, J. Kerrington Lewis, Esquire, represented respondent in this matter. Mr. Lewis was informed by respondent's wife that respondent had taken care of the matter with Ms. Jolly.

(28) By letter dated March 11, 2003, Mr. Lewis advised petitioner that he was representing respondent and respondent had refunded $4,500 to Theresa Jolly.

(29) By letter dated August 4, 2003, petitioner advised Mr. Lewis that Ms. Jolly denied that respondent had refunded any money to her.

(30) By letter dated August 11, 2003, Mr. Lewis informed petitioner that respondent had only refunded $500 to Ms. Jolly.

(31) There was a miscommunication between respondent's wife and Mr. Lewis. Respondent did not intend to misrepresent to Mr. Lewis that all of the money had been repaid.

(32) The Pennsylvania Lawyers Fund for Client Security awarded Ms. Jolly's claim in the amount of $4,900.

(33) Respondent had been making monthly payments of $400 per month to the Lawyers Fund for Client Security. As of October 22, 2004, respondent had made prin-

cipal payments of $3,200 to the Lawyers Fund for Client Security and still owed $1,700, excluding interest. Respondent currently owes approximately $1,900 to the Lawyers Fund for Client Security.

### Charge II—Sergo Charles Matter

(34) In 1999, Sergo Charles was placed in removal proceedings by the INS, and he retained respondent to represent him.

(35) Respondent requested a $1,500 retainer, which Mr. Charles paid.

(36) On August 24, 1999, respondent entered his appearance in Mr. Charles' case.

(37) On May 24, 2000, respondent represented Mr. Charles at a hearing in the removal proceedings where removability was established.

(38) The hearing was continued until October 3, 2000, and then rescheduled for January 29, 2001. At the hearing on January 29, 2001, the immigration judge considered Mr. Charles' applications for asylum, withholding and torture convention relief.

(39) At the hearing, respondent attempted to introduce into evidence a marriage license and birth certificates, which were written in Creole, without a translation.

(40) Since respondent did not have a certified translation of these documents, the judge refused their admission.

(41) Respondent later attempted to introduce Mr. Charles' military ID card without a certified translation. Respondent also attempted to introduce certain x-rays

without any medical testimony of the type of injuries that were shown on the x-rays.

(42) At the end of the hearing, the judge recessed the case before cross-examination of respondent's client, to give respondent an opportunity to enter additional corroborating testimony, including a doctor's report on the x-ray; a translation of the documents that respondent had attempted to introduce; an affidavit; and testimony from one Adeska Schiller.

(43) The hearing was postponed until May 3, 2001, at which time:

(a) Respondent failed to produce any of the evidence that he stated he would provide at the previous hearing;

(b) Respondent advised the judge he had just received a letter from Mr. Charles' wife and a cassette from Haiti, both of which were in Creole;

(c) Respondent requested that the judge accept the cassette and letter in Creole even though respondent had not followed the rules of evidence for admissibility;

(d) Respondent attempted to introduce ID cards written in Creole;

(e) Respondent asked for another continuance to further document his client's case;

(f) The judge stated on the record that respondent had been given Mr. Charles' three ID cards and respondent agreed to provide certified translations 10 days prior to the next hearing;

(g) Respondent agreed to obtain the testimony of Adeska Schiller and a declaration from Mrs. Charles;

(h) The judge further noted that respondent took notes of all that was required of his client;

(i) Respondent advised the court he would translate the letter and the cassette tape and get in touch with Mr. Charles' wife and Adeska Schiller;

(j) The judge made clear that respondent needed copies of the tape and certified transcripts of the tape for the trial attorney, the court and for himself;

(k) The judge reminded respondent that all documents must be submitted 10 days prior to the hearing;

(l) The judge adjourned the hearing to give respondent an opportunity to submit an affidavit from Mr. Charles, which had to be submitted by August 17, 2001.

(44) Respondent told Sergo Charles to get in touch with his office to get the items translated. Mr. Charles believed respondent would handle it.

(45) Respondent told the judge he would get the items translated.

(46) The court scheduled the next court date for October 15, 2001 at 1 p.m.

(47) On October 15, 2001, respondent failed to appear on Mr. Charles' behalf in Immigration Court.

(48) On the day of the hearing, Mr. Charles telephoned respondent to advise him he was on his way to court.

(49) Respondent advised Mr. Charles that he would no longer represent him and asked him to come to respondent's office.

(50) Mr. Charles went to respondent's office and respondent handed his file to him, and told Mr. Charles he would no longer represent him. Respondent did not return

x-rays, cassettes, and other items that were in respondent's possession, because respondent did not recall that he had those items as they were not in Mr. Charles' file.

(51) Respondent did not provide an explanation for his actions.

(52) Mr. Charles attended his immigration hearing without counsel.

(53) When Mr. Charles arrived at court, he discovered that respondent had not submitted a translated version of the affidavit, the cassette or other documents that he had previously given to respondent.

(54) The judge granted an additional postponement until December 19, 2001, after Mr. Charles explained that respondent had the affidavit and cassette.

(55) Mr. Charles retained new counsel.

(56) Mr. Charles' new counsel was denied a continuance to allow corroborating evidence. All relief was denied and Mr. Charles was ordered removed to Haiti. Successor counsel did succeed in having Mr. Charles' case reopened.

(57) Respondent failed to return Mr. Charles' transcript of the cassette and affidavit until February 27, 2002.

(58) It took respondent four months to return documents that were relevant to his client's case, and he made no effort to have those documents translated.

(59) Respondent failed to return other items to Mr. Charles until August 22, 2002; 10 months after respondent told Mr. Charles he would no longer represent him.

*Charge III—Karen Mahfood Matter*

(60) Lesa Fearon-Harris retained respondent to represent her daughter, Karen Mahfood, also known as Karen Mark, in a deportation hearing scheduled for October 31, 2003; to file an application for cancellation of removal; and to file any necessary adjustment of status papers.

(61) Respondent appeared at an immigration hearing on October 30, 2003, on behalf of Ms. Mahfood. At that time, respondent requested additional time to prepare the case, and a new court date was scheduled for September 1, 2004.

(62) Respondent was ordered to submit Ms. Mahfood's application for cancellation of removal on or before December 31, 2003.

(63) Respondent agreed to represent Ms. Mahfood for $4,000. Ms. Fearon-Harris signed a fee agreement on October 23, 2003 and paid respondent a portion of his requested fee. Respondent agreed that she could pay the balance at a later date.

(64) Sometime in December 2003, Ms. Mahfood came to respondent's office to discuss the case.

(65) On December 22, 2003, Ms. Mahfood brought to respondent's office the remaining documents and information that respondent said he needed to file the papers.

(66) Respondent informed his client that he had everything he needed in order to file the case and he would try to get it filed as quickly as possible.

(67) Ms. Mahfood's paperwork was ready to be filed on December 23, 2003.

(68) Respondent was hospitalized overnight on December 30, 2003, due to his bipolar condition and was discharged on December 31, 2003.

(69) Respondent required electric shock therapy on January 2, 2004, as aftercare treatment.

(70) Respondent failed to file the application for cancellation of removal by December 31, 2003.

(71) At no time prior to December 31, 2003, did respondent advise his client that he would not be able to timely file the application for cancellation of removal.

(72) On January 6, 2004, U.S. Immigration Judge J. Daniel Dowell entered an abandonment order, nearly a week after the time had expired to file the application for cancellation of removal.

(73) Judge Dowell noted that respondent did not request additional time to file and failed to provide any other timely explanation for his failure to file the application.

(74) Judge Dowell ordered that Karen Mahfood be removed from the United States to Jamaica.

(75) Respondent did not notify his client of Judge Dowell's order dated January 6, 2004.

(76) On January 7, 2004, respondent filed a motion to reopen the case and accept a late filing. In that motion respondent claimed that he was sick from December 28 through December 31, 2003. Respondent did not include any documentation concerning his medical condition.

(77) On January 8, 2004, Judge Dowell denied respondent's motion to reopen and accept late filing.

(78) Respondent failed to advise his client that he filed a motion to reopen the case and it was denied.

(79) On January 12, 2004, respondent filed a motion to reconsider the judge's order, in which respondent filed a document, consisting of a one-sentence letter from a physician that indicated respondent had been admitted to a medical facility for one night and was discharged on December 31, 2003.

(80) By order dated January 13, 2004, Judge Dowell denied respondent's motion to reconsider, and noted that he had from October 30, 2003 to December 31, 2003 to ensure a timely filing and failed to do so.

(81) On January 14, 2004, Ms. Fearon-Harris received a telephone call from Lizette Nazarewsky, respondent's office manager, who advised her that respondent failed to file the application for cancellation of removal on time because he was sick.

(82) Ms. Nazarewsky also told Ms. Fearon-Harris that respondent filed a motion to reconsider, which had been denied. She told Ms. Fearon-Harris to come and pick up her file and get another attorney to represent her.

(83) On January 16, 2004, Ms Fearon-Harris received a package from respondent's office containing paperwork, including a letter dated January 14, 2004, the contents of which is summarized as follows:

(a) Respondent enclosed a copy of the order/decision of the immigration judge ordering Ms. Mahfood to be removed from the United States to Jamaica;

(b) Respondent acknowledged payment of $100 for the filing fees;

(c) Respondent advised Ms. Mahfood that her case had been ready to be filed on December 24, 2003, but he had gotten sick and ended up in the hospital and did not file the application;

(d) Respondent filed the application for cancellation of removal on January 2, 2004 and a motion to accept late filing on January 6, 2004, which was denied by the court;

(e) On January 9, 2004, respondent filed a second motion to reopen and accept late filing, which was also denied;

(f) Respondent advised Ms. Fearon-Harris to immediately retain another attorney to try to reopen the case and offered to refer her to another immigration attorney.

(84) Ms. Fearon-Harris retained Junior Farquharson, Esquire, who reviewed the paperwork and told her that as a result of respondent's failure to file an application for cancellation of removal in a timely fashion, the court signed an order finding abandonment of relief and ordered Ms. Mahfood removed from the United States.

(85) Until that time, Ms. Mahfood did not know that the judge had entered an order to deport her.

(86) On January 22, 2004, Mr. Farquharson filed a motion to reopen and reconsider the order to be removed on behalf of Ms. Mahfood. Judge Dowell denied this motion on January 22, 2004.

(87) Respondent signed a waiver of his right to confidentiality in order to permit Office of Disciplinary

Counsel to write a letter to Karen Mahfood's new counsel, advising him that Office of Disciplinary Counsel was intending to take disciplinary action against respondent for his handling of Ms. Mahfood's immigration matter. The letter was used as a basis for requesting the prosecution to file a joint motion to open Karen Mahfood's case.

(88) The joint motion to open Karen Mahfood's case was granted.

## *Other Facts of Record*

(89) Respondent cooperated with petitioner by waiving personal service of the petition for discipline and by entering into a stipulation.

(90) Respondent was diagnosed with bipolar disorder in the 1990s and has suffered from depression most of his adult life.

(91) Respondent was hospitalized from January 23, 2003 until February 4, 2003 due to this illness.

(92) Respondent was treated for depression and underwent outpatient treatments at Florida Medical Center.

(93) Ely D. Pelta M.D. testified on respondent's behalf. Dr. Pelta has been respondent's treating physician since January 2003.

(94) Dr. Pelta believes respondent's bipolar disorder is under control and his prognosis is relatively good, providing that he stays compliant with his medication.

(95) Dr. Pelta was only vaguely familiar with the nature of the complaints against respondent.

(96) Donald W. Edwards is an attorney in the State of Florida who has been a friend with respondent since 1984. He sees or talks to respondent on a daily basis.

(97) Mr. Edwards describes respondent as a competent attorney who has never been so depressed that he cannot practice law.

(98) Respondent provided 17 letters attesting to his good character. None of the individuals who provided the character letters indicated whether they were aware of the nature of the disciplinary charges against respondent.

(99) Respondent received a letter of concern on August 5, 2003, for the following conduct. Between 1995 and 1999, respondent negotiated with insurance companies on behalf of Florida clients when he was not licensed to practice law in Florida. Respondent entered a consent decree on June 18, 1998 with the Florida disciplinary authorities in which he agreed that he would not "forward letters appearing to be from an attorney, or otherwise practice law in Florida." Respondent has complied with the consent decree.

(100) The other misconduct discussed in the letter of concern addressed the fact that respondent went on inactive status on July 1, 1998 and represented 22 immigration clients while he was on voluntary inactive status in Pennsylvania from July 1, 1998 through November 1, 1998. Furthermore, respondent represented six individuals by appearing pro hac vice in Florida courts, which was legal at the time.

(101) Respondent's position regarding his practice of law while on inactive status occurred because respondent

had inadvertently checked the inactive box on his Annual Fee form and forgot to send the fee for his registration. Immediately upon notification by Disciplinary Counsel, respondent took the necessary steps to be reinstated to active status.

(102) Respondent was sued by Emmanuel Vileinor, who was the brother of one of respondent's clients. Mr. Vileinor paid respondent $5,000 to help his brother on an immigration matter. Respondent failed to do anything to pursue his brother's case. The case was settled for $3,500, and respondent made payments. Two of the checks that respondent wrote to pay the judgment amount were dishonored, but respondent eventually paid the entire debt of $3,500.

### III. CONCLUSIONS OF LAW

By his conduct as set forth above, respondent violated the following Rules of Professional Conduct:

(1) R.P.C. 1.1—A lawyer shall provide competent representation to a client.

(2) R.P.C. 1.3—A lawyer shall act with reasonable diligence and promptness in representing a client.

(3) R.P.C. 1.4(a)—A lawyer shall keep a client informed about the status of a matter and promptly comply with reasonable requests for information.

(4) R.P.C. 1.4(b)—A lawyer shall explain a matter to the extent necessary to permit the client to make informed decisions regarding representation.

(5) R.P.C. 8.4(d)—It is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

(6) R.P.C. 1.15(b)—Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(7) R.P.C. 1.16(d)—Upon termination of representation, a lawyer shall takes steps to the extent reasonably practicable to protect a client's interest, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.

## IV. DISCUSSION

This matter is before the board for consideration of a petition for discipline filed against respondent charging him with failing to provide competent representation to clients in three immigration matters in the State of Florida. The material facts are not in dispute. Respondent stipulated and the record supports his violation of the Rules of Professional Conduct set forth in the petition for discipline. There is no question that discipline must be imposed.

The parties made a joint recommendation of discipline to the Hearing Committee, agreeing that a three-month

suspension from the practice of law and two years probation with conditions was appropriate. The recommendation further stated that the parties understood that the joint recommendation was not binding on the committee, the board or the Supreme Court. In fact, the Hearing Committee disagreed with the joint recommendation and instead recommended a suspension of one year and one day. The committee set forth its serious concerns regarding respondent's competency to practice law, including its observation that respondent's presentation of his own defense suggested his lack of competence.

Respondent raised exceptions to the committee's basis for its recommendation and contends that he was merely being cooperative and non-confrontational by proceeding "informally." Respondent further states that his competence as a legal practitioner is demonstrated by his proper filing of a motion to partially redact and partially seal record of disciplinary proceedings before the Hearing Committee on February 7, 2005. This motion was denied by the Hearing Committee by reason of respondent's failure to pursue the issue.

Petitioner responded to respondent's brief on exceptions by filing a brief opposing respondent's brief on exceptions. Therein, petitioner made a motion to reopen the record to demonstrate that respondent did not draft respondent's motion to partially redact and partially seal record of disciplinary proceedings, as Disciplinary Counsel in the matter provided respondent with a rough draft of such a motion. Petitioner's motion to reopen the record is now before the board for consideration. The board will deny petitioner's motion to reopen the record as the evi-

dence sought to be considered bears little weight to the board's review of the instant matter.

Review of the record demonstrates ample support for the Hearing Committee's recommendation of suspension for one year and one day. In the Charles and Mahfood matters, respondent's conduct could have denied those individuals an opportunity to have their cases determined on the merits, and resulted in deportation from the United States. Respondent's manner of terminating his representation of Mr. Charles was appalling and demonstrated a total lack of concern for his client. Equally abrupt was his dismissal of Ms. Mahfood as his client. In the Jolly matter, respondent retained unearned fees, after agreeing to pay them back, and failed to meet his obligation to the Pennsylvania Lawyers Fund for Client Security.

Respondent suffers from bipolar disorder, a serious psychiatric illness. He presented the testimony of his doctor, Ely D. Pelta M.D., who gave his opinion on respondent's prognosis. Dr. Pelta testified that the bipolar disorder should not prevent respondent from competent practice. Respondent's friend, Donald W. Edwards, sees or talks with respondent on a daily basis and has never seen respondent so depressed that he is not able to practice law. The bipolar disorder may have created an atmosphere which exacerbated the problems respondent experienced in his practice in general, but there is no clear and satisfactory evidence that the disease substantially caused his misconduct. Respondent indicated other stress factors in his life, such as marital and financial problems and difficult clients, which may have impacted his ability to practice law in a competent fashion.

While the board is sympathetic to respondent's situation, it has a direct charge to protect the public. Respondent cannot use his illness as an excuse or justification for his improper actions towards his clients. The board has already made allowances for respondent in his previous disciplinary matter by imposing a private reprimand and placing him on probation. Respondent failed to fulfill the conditions of the monitoring program. Probation is not an option in this matter. The board cannot allow the type of behavior exhibited in the instant matter to continue to occur. A suspension of one year and one day will allow respondent to review his practice and ascertain the best way of managing his illness and other personal difficulties while simultaneously giving his clients the professional representation he is required to give.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania unanimously recommends that the respondent, Michael Levine, be suspended from the practice of law for a period of one year and one day.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.

## ORDER

And now, June 20, 2006, the application for leave to file petition for review nunc pro tunc is granted, and, upon consideration of the report and recommendations of the Disciplinary Board dated February 13, 2006, the petition for review and responses thereto, the request for oral argument is denied pursuant to Rule 208(e)(4),

Pa.R.D.E., and it is hereby ordered that Michael Levine be and he is suspended from the bar of this Commonwealth for a period of one year and one day, and he shall comply with all the provisions of Rule 217, Pa.R.D.E.

It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.